*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0316p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMES W. SMOAK et al.,

         *Plaintiffs-Appellees,*

   *v.*

ERIC HALL et al.,

         *Defendants,*

DAVID BUSH; JEFF PHANN; TIM MCHOOD; BRIAN
BROCK; JERRY ANDREWS, Lieutenant,

         *Defendants-Appellants.*

No. 05-6511

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 03-00117—William J. Haynes, Jr., District Judge.

Argued: July 20, 2006

Decided and Filed: August 25, 2006

Before: GILMAN and COOK, Circuit Judges; DOWD, Senior District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael B. Leftwich, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville,
Tennessee, for Appellants. Mary A. Parker, PARKER & CROFFORD, Nashville, Tennessee, for
Appellees. **ON BRIEF:** Michael B. Leftwich, TENNESSEE ATTORNEY GENERAL'S OFFICE,
Nashville, Tennessee, for Appellants. Mary A. Parker, PARKER & CROFFORD, Nashville,
Tennessee, for Appellees.

     GILMAN, J., delivered the opinion of the court. COOK, J. (pp. 14-15) and DOWD, D. J.
(pp. 16-17), delivered separate opinions concurring in part and dissenting in part.

_____

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio,
sitting by designation.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  This case provides a classic example of how plausible but unsubstantiated speculation and miscommunication on the part of law enforcement officers can cause grievous consequences to innocent citizens.  It also highlights how, in time-sensitive situations, officers are often forced to make difficult judgments that appear improvident through the lens of hindsight.  The innocent citizens in this case were James Smoak, his wife Pamela Smoak, and Pamela's teenage son Brandon Hayden (the Smoaks), who brought a civil-rights action against five members of the Tennessee Highway Patrol (THP) after three of its troopers pulled over the Smoaks' car in the mistaken belief that they were the perpetrators of a robbery.

Because the troopers decided to conduct a "felony stop" of the Smoaks' vehicle, the family was removed from their car at gunpoint, handcuffed, and separately placed in the back of three squad cars.  James Smoak also sustained a knee injury when he was forcibly restrained after the family's dog was shot to death by a local police officer on the scene.  The district court held that none of the defendants were entitled to qualified immunity based upon the Smoaks' claims under the Fourth Amendment, but it dismissed the Smoaks' state-law conspiracy claim.  For the reasons set forth below, we **REVERSE** the district court's denial of qualified immunity with respect to all aspects of the Smoaks' claims other than James Smoak's claim of excessive force against THP troopers Jerry Andrews and David Bush.  As to this latter claim, we **AFFIRM** the district court's denial of qualified immunity and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.      Factual background

On January 1, 2003, the Smoaks were traveling home to the Carolinas after spending New Year's Eve in Nashville.  Their two young dogs, General Patton and Cassie, were also riding inside of their green Mercury station wagon.  After stopping at a gas station to refill the tank, James accidentally left his wallet on the roof of the car before driving off.

At 4:40 p.m. that afternoon, Veronica Louwien called the THP and spoke to dispatcher Shanon Pickard.  She told Pickard that

> [m]y name is Veronica Louwien, and I'm driving down Interstate 40 in Wilson County, going towards Lebanon.  I passed the Mt. Juliet Exit, and a car passed me.  It was kind of like a station wagon.  It was dark green.  It was probably going 110 miles an hour.  And then not too far in front of me, there was money flying all over the interstate . . . ."

Pickard responded by sending state troopers to the scene to meet Louwien.

After assessing the scene, the troopers reported to Pickard that they found a lot of loose currency, but they did not inform him of the actual amount—which turned out to be $445—at that time.  Pickard then contacted local law enforcement, including police dispatchers in the City of Cookeville, and told them to look for a green station wagon traveling at a high rate of speed.  He also sent a teletype to area law enforcement inquiring if a "recent robbery" had occurred, possibly involving a green station wagon.

Once Pickard was informed that the amount recovered on the highway was only $445, and that a wallet was found at the scene, he no longer considered the green station wagon to be involved

in a robbery. The parties dispute when Pickard was told the actual dollar amount, but both sides agree that Pickard did not relay this information to the other dispatchers until after the Smoaks' station wagon had been stopped.

In Cookville, THP dispatcher Brian Brock, who had taken the initial call from Pickard, put out a "be on the lookout" (BOLO) notification for the vehicle, stating that a green station wagon had been seen traveling at a high rate of speed and had lost a large amount of currency. Tim McHood, another THP dispatcher in the general vicinity, issued a second BOLO, stating that the vehicle was possibly involved in a robbery. He based this on a misreading of Pickard's teletype inquiring about any recent robberies, which he took to mean that the station wagon was involved in a "possible robbery," but "[w]e're not sure."

McHood then received another call from Pickard, who had been told by the troopers at the scene that a wallet with a South Carolina identification belonging to James Smoak had been found with the money. This caused McHood to send out another broadcast informing law enforcement that the green station wagon was from out of state, and that large amounts of money and an ID were found.

David Bush, a THP trooper who had heard the BOLOs and the messages about a "possible recent robbery," spotted the green station wagon traveling east on Interstate 40 and followed it for approximately eight miles. During that time, he did not observe the vehicle speeding or committing any other traffic violations. Bush was told by McHood that the license-plate information from the station wagon matched Smoak's identification found with the currency. According to the district court and the THP troopers, McHood also instructed Bush to stop the Smoaks' car, but that Bush should not do so without backup. The Smoaks, however, dispute this and claim that "Bush was solely responsible for the decision to ask for back-up."

McHood and Bush then requested backup from other THP troopers in the area, and THP dispatcher Brian Brock called City of Cookeville police dispatchers for additional backup. Brock told the city dispatchers that "we're fixing to have a felony stop on a vehicle . . . possible armed robbery out of Nashville." Before pulling over the Smoaks' station wagon, Bush requested and received confirmation that the Nashville division of the THP wanted the vehicle stopped. Lieutenant Jerry Andrews and Trooper Jeff Phann of the THP and two Cookeville police officers joined Bush as backup to participate in the stop.

At the time of the stop, Bush had been a trooper with the THP for nine years and had conducted six felony stops involving stolen vehicles. He testified at his deposition that "based on my training, if there's any probability that a felony has occurred, we treat that as a high-risk stop. And based on the information that my dispatch was giving me, that's the reason I utilized a felony stop."

The felony stop of the Smoaks' car occurred at 5:15 p.m. At that time, the THP in Nashville relayed that it had the exact amount of cash found in the median, but neither McHood nor the troopers in the field inquired as to the amount. A videotape recording by the camera in Bush's car, which is part of the record, captures most, but not all, of the events of the stop.

After the station wagon was pulled over, Bush instructed the Smoaks to individually exit their vehicle, place their hands in the air, and then to get on their knees with their hands behind their backs. As the Smoaks were being handcuffed, the two Cookeville police officers pointed an assault rifle and a shotgun in the direction of the Smoak family, who incredulously inquired as to why they were being stopped. The Smoaks claim that the weapons were aimed at their heads. For the purpose of the summary judgment motion, the THP troopers admit that pointing a gun at a suspect, absent the justification for deadly force, is a significant departure from customary professional police

practices, and that the correct position of an officer's gun is in the "down ready" position until deadly force is warranted.

The Smoaks asked the THP troopers several times to "please shut the door[s]" of the station wagon so that their dogs would not escape onto the highway. When Hayden asked Trooper Phann to close the passenger-side door, Hayden was told not to move. Phann believed that he would be jeopardizing his own safety if he had to reach over Hayden's head to shut the vehicle's door. Lieutenant Andrews then approached the driver's side of the vehicle, determined that it was empty, and closed the driver-side door.

While Phann was handcuffing Hayden, General Patton, a one-year-old bulldog/bull terrier mix, jumped from the still-open passenger-side door. Andrews stated in his deposition that 30 seconds to one minute elapsed between him shutting the driver-side door and General Patton jumping out of the car. What followed is disputed by the parties. The Smoaks claim that the dog began to run in a semicircle, with his tag wagging, in order to reach James. They further assert that Eric Hall, one of the Cookeville police officers on the scene, then placed himself in General Patton's path and killed the dog with his shotgun. The THP troopers contend, however, that the dog moved toward Hall after exiting the vehicle, and that Hall backed away before firing at the dog.

At that point, James, who was handcuffed, jumped up in horror and was restrained by Andrews and Bush, who wrestled him back to the ground. James claims that he was "forced down to the ground by Officer Bush and Lt. Andrews" and that "Bush knocked his legs out from under him, and threw him to the pavement face-first." He badly injured his knee during the incident, was admitted to the hospital that night, and later underwent surgery to repair the injury. James also alleges that his head hit the pavement, but the record reflects no specific medical attention relating to his head or face.

Pamela also jumped up after General Patton was shot, causing the Cookeville officers to point their guns at her as Phann placed her back on her knees. The Smoaks were then put in separate patrol cars, in front of which Bush and Hall can be seen on the videotape grinning and laughing. At 5:23 p.m., Bush advised dispatcher Brock that the Smoaks were in custody and Brock should "ask Nashville the charges." Bush was then told that no robberies had been reported and that James was not wanted for any crimes. At that point, Andrews and Bush determined that a mistake had been made, but the last of the handcuffs was not taken off until nine minutes later.

The entire incident lasted 29 minutes, although the Smoaks claim that the THP troopers knew that the Smoaks were innocent of all wrongdoing within the first ten minutes. After the Smoaks drove off, the videotape shows Bush lamenting that "I wish I had never stopped that f. . .king car." Bush said in his deposition, however, that he would have made a felony stop even without the information concerning a possible robbery because a speeding vehicle with a wallet and money coming out of it could indicate a carjacking. But Andrews and Phann testified that they would not have conducted a felony stop if they had had all the facts known to the dispatchers at the time. Pickard had actually joked with another THP dispatcher that someone had probably lost all his money, which reminded him of something his kids would do.

## B.    Procedural background

The Smoaks brought suit against the City of Cookeville and two groups of individuals—the officers and dispatchers from Cookeville on the one hand and the THP troopers and dispatchers on the other—under 42 U.S.C. § 1983. They alleged violations of their rights under the Fourth Amendment, including claims of an unreasonable seizure and excessive force. The complaint also alleged violations of various state laws, all but one of which were dismissed for failure to state a claim. This left the state-law allegation that the THP troopers conspired to protect Hall by making

false statements in police reports and to the media. By stipulation of the parties, the City of Cookeville and all of the Cookeville defendants were subsequently dismissed, including Hall, the police officer who shot General Patton. After limited discovery, the THP troopers and dispatchers—the only remaining defendants—moved for summary judgment on the Smoaks' unreasonable-seizure, excessive-force, and conspiracy claims.

The district court dismissed the Smoaks' conspiracy claim as unsupported by the facts. But based on the evidence viewed in the light most favorable to the Smoaks, the court concluded that a trier of fact could determine that (1) the high-risk felony stop was conducted without specific articulable facts that a crime had been committed or that the Smoaks were armed and dangerous, (2) the manner in which the stop was conducted was unreasonable, and (3) the officer's excessive reaction to the limited information available converted the stop into an arrest, requiring probable cause. Although the district court did not "discern any actual excessive force" from the restraint of James, its order nonetheless denied summary judgment on all aspects of the Smoaks' excessive-force claim. The three THP troopers and two dispatchers then timely filed this interlocutory appeal from the denial of qualified immunity.

## II. ANALYSIS

### A.      Jurisdiction

Although a district court's denial of qualified immunity on purely legal grounds is immediately appealable, "[a] denial of qualified immunity that turns on evidentiary issues is not." *Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997). "[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). This is because interlocutory appeals are limited to questions that present "neat abstract issues of law." *Turner*, 119 F.3d at 428 (citations and quotation marks omitted).

In the present case, the district court denied qualified immunity on the basis of genuine and material evidentiary disputes, holding that "a trier of fact could reasonably conclude that" the THP troopers effectuated an unreasonable seizure. For the purposes of this interlocutory appeal, the THP troopers have accepted the Smoaks' version of the facts as true and still argue that qualified immunity is warranted. Jurisdiction is proper under such circumstances. *See Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (holding that the issue of "whether the facts as alleged by [the plaintiff] demonstrate a violation of a clearly established constitutional right" presents a "neat abstract issue of law") (citations and quotation marks omitted); *Turner*, 119 F.3d at 428 ("The question of whether the uncontested facts demonstrated a constitutional violation is a pure question of law—and one from which an immediate appeal can be taken where qualified immunity has been denied.")

In the present case, the THP troopers argue in both their initial and their reply briefs that "summary judgment would still be appropriate even if Mr. Smoak's version of events were taken as true." We therefore have jurisdiction over this interlocutory appeal, but will ignore the THP troopers' attempts to argue that the Smoaks' factual allegations lack evidentiary support. *See Johnson*, 515 U.S. at 319 (holding that appellate courts may not review "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial" when the denial of qualified immunity is reviewed on interlocutory appeal).

### B.      Qualified immunity framework

In order to prevail on a claim brought pursuant to 42 U.S.C. § 1983, the Smoaks "must establish that a person acting under color of state law deprived [them] of a right secured by the

Constitution or laws of the United States." *See Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). They must also overcome the defense of qualified immunity, which shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205.

Throughout the analysis, the burden is on the Smoaks to show that the defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."). A right is "clearly established" for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been held unlawful. *See Sample*, 409 F.3d at 698. The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 202. Before we can answer this question, which was not addressed by the district court, we must determine whether the Smoaks' constitutional rights were violated at all, either through an unreasonable seizure or through the use of excessive force.

## C.    Unreasonable seizure

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." These safeguards of the Fourth Amendment, "with respect to police/citizen contact, vest only after [a] citizen has been seized." *United States v. Richardson*, 949 F.2d 851, 855 (6th Cir. 1991). A seizure occurs where, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that police officers are permitted to conduct a limited type of seizure—the "investigatory stop"—in the absence of probable cause:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment.

*Id.* at 30-31; *see also id.* at 27 (holding that a police offer may conduct a cursory "stop and frisk" of a suspect if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"). The Court in *Terry* struck a balance between the "public

interest and the individual's right to personal security," *United States v. Brigoni-Ponce*, 422 U.S. 873, 878 (1984), and determined that an investigatory stop is permissible if supported by an officer's "reasonable suspicion" that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Reasonable suspicion is, of course, a "somewhat abstract" concept. *Id.* at 274. It requires more than just a "mere hunch," but is satisfied by a likelihood of criminal activity less than probable cause, and "falls considerably short of satisfying a preponderance of the evidence standard." *Id.* If an officer possesses "a particularized and objective basis for suspecting the particular person . . . of criminal activity" based on "specific and articulable facts" he may conduct a *Terry* stop. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-14 (6th Cir. 1999) (citations and quotation marks omitted). Courts must examine the "totality of the circumstances" to determine whether reasonable suspicion existed to justify a *Terry* stop. *Id.*

In determining the reasonableness of a *Terry* stop, however, the degree of the THP troopers' suspicion is only one aspect of the inquiry. "The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." *Terry*, 392 U.S. at 28. Moreover, "[t]he scope of activities during an investigatory stop must reasonably be related to the circumstances that initially justified the stop." *Richardson*, 949 F.2d at 856. If the manner if which an investigatory stop is conducted is unreasonable, the seizure then ripens into an arrest, which must be supported by probable cause. *United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986) (holding that because "the use of arms was reasonably necessary under the circumstances," the investigative stop was not converted into an arrest).

The reasonableness of a stop is thus determined by two factors: "(1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* at 356. In other words, the greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing.

In the present case, the Smoaks argue that (1) the information known to law enforcement was insufficient for the THP troopers to pull over the station wagon and conduct a *Terry* stop, and (2) the stop became an arrest due to the degree of the intrusion and the amount of force used. The district court agreed with the Smoaks on both counts.

### 1.    *Was the seizure based on reasonable suspicion?*

Reasonable suspicion need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) ("A law enforcement officer is generally justified in stopping an individual and asking for identification when relying on information transmitted by a valid police bulletin."). In the present case, Andrews, Bush, and Phann relied on the BOLOs mentioning a "possible robbery" involving a green station wagon, and on the dispatchers' information that the station wagon had been speeding with money flying out of it.

A seizure conducted in reliance on a flyer or dispatch does not violate the Fourth Amendment if the law enforcement officer who issued the information possessed the necessary reasonable suspicion. *United States v. Hensley*, 469 U.S. 221, 231-32 (1985) (holding that the constitutionality of a seizure "does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance"). In *Hensley*, the police interviewed an informant who told them that Hensley had driven the getaway car during an

armed robbery. *Id.* at 223. A "wanted flyer" was then issued that led to the seizure of Hensley. *Id.* The Supreme Court held that because "an experienced officer could well assume that a warrant might have been obtained[,] . . . the flyer would . . . justify a brief detention at the scene of the stop." *Id.* at 234. Elaborating on this point, the Court said that

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person had committed an offense, then reliance on the flyer or bulletin justified a stop to check identification . . . . If the flyer has been issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.

*Id.* at 232.

In the present case, the totality of the circumstances convince us that the dispatchers on whom Bush relied had a reasonable suspicion that some mishap had occurred. Ms. Louwien reported a green station wagon traveling at a very high rate of speed on the Interstate and money flying out of the vehicle, and law enforcement met Louwien at the scene and observed a significant quantity of currency in the median. The dispatchers relaying this information to the THP troopers in the field did not, however, have sufficient reason to believe that a robbery had occurred, which would have permitted the officers to conduct a much more intrusive felony stop. There were no robberies reported and, as the district court found, "McHood introduced the idea of a possible robbery for which he did not have any factual basis." Brock then introduced the idea that the robbers had possibly been armed, which again had no basis in fact. In addition, only $445 dollars was found at the scene, along with a wallet. The dispatchers issuing the BOLOs should have promptly given the THP troopers in the field a count of the money once it was available. Andrews and Phann admitted that, had they known all of the information then available to the dispatchers, they would not have conducted a felony stop of the Smoaks' car.

Besides examining the information known to the dispatchers, we must consider the facts known to the THP troopers who actually participated in the seizure—Andrews, Bush, and Phann. This is because reasonable suspicion is measured by "all of the information available to law enforcement officials at the time." *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (holding that an anonymous tip did not give the police reasonable suspicion to stop a bearded, shirtless white male suspected of threatening his neighbors). Bush, for example, knew that the individuals inside the green station wagon had not engaged in any suspicious behavior, including speeding, for the eight miles that he followed them.

Based on the totality of the circumstances, we conclude that the THP troopers had a reasonable suspicion sufficient to conduct a *Terry* stop. But because this suspicion was undercut by the fact that only $445 dollars had been found at the scene along with a wallet, and that no robberies had been reported, we must carefully scrutinize the manner in which the seizure was conducted in deciding whether the intrusiveness of the seizure comported with the degree of reasonable suspicion. *See Hardnett*, 804 F.2d at 356-57 (balancing the intrusiveness of a seizure against the degree of the officer's reasonable suspicion based on the totality of the circumstances).

### 2.          *Did the seizure become an arrest?*

"When police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is "reasonably related to the basis for the original intrusion." *Houston*, 174 F.3d at 814. *See also United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006) ("The investigative

means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time.")

Here, the Smoaks were instructed over a squad-car loudspeaker to exit their vehicle, and guns were aimed at them while they walked backwards away from it. They were then handcuffed while on their knees, and their pleas for the officers to shut the station wagon's doors were ignored. Once the Smoaks were in handcuffs, and after their dog was shot to death, the Smoaks were placed in separate squad cars and questioned. After the officers learned that no robberies had been reported, the Smoaks still had to ask multiple times over the course of nine minutes for the officers to remove their handcuffs. *See Houston*, 174 F.3d at 815 (holding that a detention that "wrongfully extended some twenty minutes beyond the time that the officers surmised that no shooting had occurred" was reasonable only because "the officers still reasonably suspected Houston and Perkins in a serious and violent crime").

Although the use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, these displays of force must be warranted by the circumstances. *Houston*, 174 F.3d at 815. In *Houston*, the court held that the officers reasonably drew and aimed their weapons at the occupants of a car because the officers possessed reliable information that the suspects had been involved in the shooting of a police officer. *Id.* This information, according to the court, gave the officers a "reasonabl[e] fear that [the] suspects were armed and dangerous." *Id.* at 814.

In the present case, the THP troopers possessed nothing more than a bare inference that the Smoaks had been involved in a robbery, and weaker still was any inference that they had been involved in an *armed* robbery. The troopers' information was further limited because the dispatchers did not promptly relay to them all the relevant data at hand. Even if Andrews, Bush, and Phann initially had a reasonable basis to believe that the Smoaks were armed and dangerous, these fears should have been dispelled much more quickly, and, in fact, were dispelled nine minutes before the Smoaks were released from their handcuffs. The use of guns pointed at the Smoaks, the refusal to comply with the Smoaks' pleas to shut the vehicle doors due to the dogs inside, and the prolonged detention in separate police cruisers indicate that Andrews, Bush, and Phann did not use the least intrusive means necessary to conduct a preliminary investigation of a "possible robbery." *See Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) (holding that the seizure of suspected thieves constituted an arrest due to "(1) the numerous oppressive elements of the encounter between the police and the plaintiffs, (2) the limited evidence that there was a crime, and (3) the absence of any indication that plaintiffs were armed or dangerous").

Accepting the Smoaks' version of events as true, the manner in which this investigatory stop was conducted—even acknowledging that Andrews, Bush, and Phann believed that a "possible robbery" had been committed—far exceeded the reasonable suspicion of an objective THP trooper. The Smoaks had obediently complied with the THP troopers' orders while the Cookeville police officers aimed loaded guns at the Smoaks' heads, and the troopers had refused to afford them even the courtesy of ensuring the safety of their two pets. In balancing the THP troopers' suspicion—based on an unsupported dispatch alerting the troopers to a "possible robbery"—against the intrusiveness of the seizure, we conclude that the seizure of the Smoaks violated their Fourth Amendment rights because it became an arrest without probable cause.

The Smoaks have not, however, met their burden of demonstrating that the THP troopers on the scene should have known that the unreasonable seizure was in violation of the Smoaks' constitutional rights. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."). Caselaw from this circuit has endorsed the use of guns and handcuffs during a felony stop, even if only as part of an investigatory seizure. *Houston*,

174 F.3d at 815. Although the use of guns and handcuffs in the present case was unreasonably intrusive, prior decisions had not made this clear.

We are also faced with the question of whether the approximately nine minutes that the Smoaks spent in handcuffs after the THP troopers were informed that no robberies had occurred is enough to deny the troopers qualified immunity. The law is clear that "[o]nce the purposes of the initial traffic stop [are] completed, there is no doubt that the officer [can] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the reasonable suspicion to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). As a result, the traffic stop morphed into an arrest. But the THP troopers were still in the process of sorting out the disconnect between why they had pulled over the Smoaks in the first place and the new information received from the dispatchers. The Smoaks were also justifiably agitated and upset over the loss of their dog, and the troopers wanted to diffuse the situation. In this confusing factual scenario, we believe that the few extra minutes that the troopers took to release the Smoaks was not so unreasonable as to deny them the protection of qualified immunity.

The circumstances in the present case, in our opinion, are analogous to the situation presented in *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003). In *Feathers*, this court ruled that although a seizure violated the Fourth Amendment because police officers stopped a suspect based on a dispatcher's inaccurate report, the officers were entitled to qualified immunity. *Id.* at 851. Qualified immunity was granted because "the individual defendants had a sufficient factual basis for thinking that they were acting consistently with *Terry*." *Id.* Similarly, Andrews, Bush, and Phann relied on weak inferences and incomplete BOLOs discussing a "possible robbery" in determining to conduct a high risk felony stop. But Bush even checked with the Nashville division of the THP to confirm that it wanted him to stop the Smoaks' vehicle. Based on *Feathers*, we conclude that the THP troopers have a "good-faith defense" relating to the felony stop. *Id.* (citations and quotation marks omitted). This conduct, in other words, which in hindsight must be viewed as an unreasonable seizure under the totality of the circumstances, was not so clear to the THP troopers on the scene as to deny them qualified immunity on this basis. Andrews, Bush, and Phann are therefore entitled to qualified immunity on the Smoaks' claim of unreasonable seizure.

**D.     Excessive force**

Insofar as the Smoaks' claim of excessive force relates to the intrusiveness of the seizure once the stop was made, the discussion above is fully applicable. The Smoaks further claim, however, that the THP troopers used excessive force against James in particular, causing injuries to his knee.

The Fourth Amendment prohibits the use of excessive force by arresting and investigating officers. *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (holding that a jury could find that the police officers used excessive force in placing a wheechair-bound suspect in the back of their squad car). Courts must determine whether a particular use of force is reasonable based on "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In evaluating the reasonableness of force used, courts should examine "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (citations and quotation marks omitted). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

The Smoaks contend that after General Patton was shot, "Mr. Smoak jumped up while in handcuffs as a result of his dog being murdered in front of his family. Two officers quickly grabbed

him, Trooper Bush knocked his legs out from under him, and threw him to the pavement face-first." James also claims that he was "forced down to the ground by Officer Bush and Lt. Andrews." The district court commented that it did "not discern any actual excessive force" from this aspect of the Smoaks' claim, but the court's order does not reflect this determination. Instead, the order denied summary judgment to the THP troopers on all of the Smoaks' Fourth Amendment claims.

In many of the cases involving excessive force, the plaintiff's resistance is what triggered the use of force from the officers. *See, e.g., Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (holding that the officers' use of force to handcuff a suspect was necessary because the suspect "acknowledged that he 'twisted and turned some' when they tried to handcuff him and that the officers had difficulty restraining him"); *Darrah*, 255 F.3d at 307 (upholding an officer's use of force because "Officer Bragg and the other members of his arrest team were in the middle of a boisterous and unruly group of picketers attempting to make an arrest of an individual who was resisting their efforts"); *see also Tapp v. Banks*, 1 F. App'x 344, 350 (6th Cir. 2001) (unpublished) (holding that "it is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times in the absence of resistance").

James, in contrast, was initially compliant with the police officers' demands, and he jumped up only after his dog had been shot right in front of him. Given that James was handcuffed, a reasonable officer would not have "knocked his legs out from under him, and [thrown] him to the pavement face-first." James alleges that he suffered physical injuries that required both admission to a hospital and subsequent surgery. A jury could find that a reasonable officer would not have reacted this forcefully to a handcuffed man who showed no signs of noncompliance until his pet was killed in front of his family.

The THP troopers argue, however, that James' allegations are unambiguously controverted by the videotape taken of the incident. This argument fails because the video does not so clearly undermine James's claim as to permit us to ignore our charge to accept all of the Smoaks' allegations as true. *See Turner*, 119 F.3d at 428 (holding that defendants may collaterally appeal the denial of qualified immunity only when the facts are uncontested). Although the video does not appear to show any swiping of James's legs, his head twice gets very close to the ground before going out of the camera's range, which is consistent with his allegations.

Based on the facts as alleged by the Smoaks, James was handcuffed, generally compliant, and obviously reacting in horror to the shooting of his dog. The law is clearly established that, in this situation, tackling James in the manner he alleges would not have been a reasonable way to restrain him. *Cf. Burchett*, 310 F.3d at 944 (permitting officers to tackle a suspect who was resisting arrest). We therefore affirm the district court's denial of qualified immunity to Andrews and Bush on this one aspect of the Smoaks' excessive-force claim. This is not to say that a jury hearing all of the evidence will ultimately agree with James's version of the facts, but we are unable to hold as a matter of law that his version is not worthy of belief.

## E.     Brock and McHood

Finally, the Smoaks claim that "[d]ispatchers Brock and McHood are liable for their failure to protect [the Smoaks] from the use of excessive force and their unlawful arrest." Citing *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), the Smoaks contend that "[o]fficers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights." In *Bruner*, a man found asleep in his car testified that he was severely beaten with a flashlight by one police officer while the others watched. The court in *Bruner* held that the onlookers could be held liable because "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." *Id.* at 426.

"Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Those present for an unconstitutional seizure can also be held liable for failure to protect. *See Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982) (holding that an officer "was directly responsible for and personally participated in the deprivation of the Smiths' constitutional rights" because he "was present while the other officers unlawfully searched the apartment and thereby violated the Smiths' rights").

In the present case, however, Brock and McHood were neither supervisory officers nor were they present at the scene. An unpublished case from this circuit indicates that at least one of these two factors would have to be satisfied in order to hold Brock and McHood liable for negligently alerting Andrews, Bush, and Phann to a "possible robbery." *See Sargent v. City of Toledo Police Dep't*, 150 F. App'x 470, 474 (6th Cir. 2005) (unpublished) (holding that "supervisory officers who order a subordinate officer to violate a person's constitutional rights and non-supervisory officers present during a violation of person's civil rights who fail to stop the violation can be liable under § 1983"); *see also Barton v. Norrod*, 106 F.3d 1289, 1299 (6th Cir. 1997) (holding that "a non-supervisory law enforcement officer *present* at a scene where other officers are violating a person's civil rights may have a duty to intervene") (emphasis added).

On the other hand, we have found no cases in this circuit where a nonsupervisory officer who was not present at the scene or did not actively participate in a constitutional deprivation was held liable for the failure to prevent the constitutional violation from occurring. In one case from the Northern District of Illinois, a dispatcher was held liable for incorrectly telling police officers in the field that a warrant had been issued for the arrest of a woman when in fact her sister was the subject of the warrant. *Bibart v. Stachowiak*, 888 F. Supp. 864 (N.D. Ill. 1995). *Bibart* is distinguishable, however, because the dispatcher in that case was relaying incorrect information to the arresting officer about whether or not a warrant had been issued. Here, in contrast, the dispatcher drew a plausible inference that a "possible robbery" had occurred based on reports of a speeding station wagon and flying cash. The dispatcher in *Bibart* was a much greater participant in the arrest—and made a much graver error—than Brock and McHood.

We therefore hold, based on the facts before us, that the dispatchers are not liable for their negligent transmissions or their failure to ascertain more details before sending out BOLOs mentioning a possible robbery. In most contexts, "negligence is insufficient to support a § 1983 claim," *Brown v. Kordis*, 46 F. App'x 315, 317 (6th Cir. 2002) (unpublished); *see also Young v. City of Little Rock*, 249 F.3d 730, 735 (8th Cir. 2001) (holding that a dispatcher's mistake about the existence of an arrest warrant was "not sufficient to render an arrest 'unreasonable' within the meaning of the Fourth Amendment"). Given that there is no evidence of deliberate indifference or recklessness on the part of Brock and McHood, the Smoaks have not established a basis to hold the THP dispatchers accountable for a seizure in which they did not directly participate. *See Brown*, 46 Fed. App'x at 317 (holding that, generally, negligence is insufficient to support a civil rights action).

### III. CONCLUSION

We wish to emphasize that, although we are granting qualified immunity to the THP troopers on most aspects of the Smoaks' claims, we do not condone the actions of law enforcement in this case. That said, a multitude of factors contributed to this unfortunate incident. James Smoak was careless in leaving his wallet on the roof of his car. Veronica Louwien likely exaggerated the speed of James's vehicle and the amount of money that was "flying all over the Interstate." The dispatchers were dilatory in giving the troopers in the field a full account of what they knew. Finally, the troopers on the ground overreacted to the situation they faced. Yet the only two factors that were clearly beyond the pale in the entire unfortunate incident were the killing of the Smoaks'

dog and the injury to James's knee. The first of these factors has been resolved by the Smoaks' stipulation to drop Hall, the shooter of the dog, as a defendant in this case. We have now resolved the other factor by denying qualified immunity to Andrews and Bush on the claim that they used excessive force in restraining James after the dog was shot.

The validity of all of the other claims of unreasonable seizure and excessive force have been demonstrated through the benefit of hindsight, but these constitutional violations committed by the THP troopers were not so clearly established at the time as to deny the defendants the benefits of qualified immunity. Although events like these can shake our faith in the ability of law enforcement to punish wrongdoers and protect the innocent, we must remember that police officers walk a fine line between upholding the liberty interests guaranteed by the Fourth Amendment and properly performing their job. The Fourth Amendment was violated in this case, but qualified immunity exists so that reasonable mistakes made while walking this line do not serve as a deterrent to effective law enforcement. *See Saucier*, 533 U.S. at 206 (holding that qualified immunity is designed to "protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful") (citation and quotation marks omitted).

For all of the reasons set forth above, we **REVERSE** the district court's denial of qualified immunity with respect to all aspects of the Smoaks' claims other than James Smoak's claim of excessive force against THP troopers Andrews and Bush. As to this latter claim, we **AFFIRM** the district court's denial of qualified immunity and **REMAND** the case for further proceedings consistent with this opinion.

_____

**CONCURRING IN PART, DISSENTING IN PART**

_____

COOK, Circuit Judge, concurring in part and dissenting in part. Because the same reasoning that supports qualified immunity for the unreasonable-seizure claim supports qualified immunity for Officer Bush and Lieutenant Andrews on the excessive-force claim, I respectfully dissent from the portion of the majority opinion affirming the denial of qualified immunity.

The majority properly immunizes all of the steps in the encounter leading up to the officers' use of force. From the majority's discussion of the seizure claim, we know that the officers conducting this stop—which, by virtue of its intrusiveness morphed from a permissible *Terry* stop into an unconstitutional arrest-without-probable-cause—merited immunity from suit because the Smoaks did not carry "their burden of demonstrating that the THP troopers on the scene should have known that the unreasonable seizure was in violation of the Smoaks' constitutional rights." (Maj. Op. at 10.) So too should go the excessive force claim.

The majority offers three interrelated statements in denying immunity:

"Given that James was handcuffed, a reasonable officer would not have 'knocked his legs out from under him, and [thrown] him to the pavement face-first.'" (Maj. Op. at 11.)

"A jury could find that a reasonable officer *would not have reacted this forcefully* to a handcuffed man who showed no signs of noncompliance *until his pet was killed in front of his family*." (Maj. Op. at 11 (emphasis added).)

"James was handcuffed, generally compliant, and *obviously reacting in horror to the shooting of his dog*. The law is clearly established that, *in this situation*, tackling James in the manner he alleges would not have been a reasonable way to restrain him." (Maj. Op. at 11 (emphasis added).)

From these it appears that the dog-shooting circumstance (focused on James's perspective) steers the excessive force analysis: either the use of *any* force cannot pass muster because James's understandable reaction to seeing his dog shot ought to have constrained the officers, or the *degree* of force exerted ought to have been moderated in view of James's having witnessed the dog-shooting.

Yet the majority acknowledges that resistance by an arrestee may justify the use of force by an officer. (*See* Maj. Op. at 11 (citing cases).) And when James, though handcuffed, jumped to his feet upon the shooting of the dog despite being ordered to remain in the kneeling position (a position meant to protect the officers during the initial stage of this felony stop), a reasonable officer could have viewed that move as resistance, necessitating the use of restraining force. From the "perspective of a reasonable officer on the scene," *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001), the actions of James—believed at the time to be a possibly armed felon—could also be viewed as posing a danger to those at the scene. The totality of the circumstances, as with the seizure, warrants immunizing the officers' decision, even if mistaken, to use force to restrain James. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."); *Scott v. Clay County*, 205 F.3d 867, 873–74 n.9 (6th Cir. 2000) ("[Qualified immunity] sweeps broadly, affording [state officials] ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (internal quotation omitted)).

As for the degree of force used to restrain James, determining whether the force used during a seizure is objectively reasonable depends on the totality of the circumstances, including (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

As the majority acknowledges, the district court, after viewing the record evidence (including the videotape of the incident), did not "discern any actual excessive force" from the restraint of James. The majority's analysis itself says only that "the video does not so clearly undermine James's claim . . . ." (Maj. Op. at 11.) But qualified immunity is meant to protect officers from the "'hazy border between excessive and acceptable force.'" *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000)). In negotiating that "hazy border," Bush and Andrews found themselves in the midst of a nighttime felony stop (possible armed robbery) involving multiple persons on the berm of a highway—with the added feature of the discharge of a firearm contributing to the chaos. Given the appearance of resistance and disobedience by James, the officers' use of force cannot be equated with the objectively unreasonable actions of officers in cases such as *Tapp v. Banks*, 1 F. App'x 344 (6th Cir. 2001) ("[I]t is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times in the absence of resistance.") (cited by Maj. Op. at 11) or *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (explaining that no reasonable officer would believe that "gratuitously mac[ing] a helpless and incapacitated person" would not be excessive). Rather, the alleged excessive force in this case consists solely of returning to his knees a suspected armed robber who non compliantly jumped to his feet.

Bush's and Andrews's actions in restraining James merit the same benefit of the doubt as did the actions of the other officers during this unfortunate encounter. And because the Smoaks failed to carry their burden of demonstrating that Bush and Andrews should have known that the restraining of James was unreasonable in the situation they confronted, the law of qualified immunity protects them from being subjected to trial.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

DAVID D. DOWD, JR., Senior District Judge, concurring in part and dissenting in part. It is well-established that there is a Fourth Amendment right to be free from the use of excessive force and a police officer engaging in excessive force is not protected by qualified immunity. *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994). Even if excessive force occurs in the context of a legitimate seizure, such as a *Terry* stop, the same legal principle applies. *See, e.g., Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997) ("even when an officer has probable cause to seize an individual, the officer must employ a reasonable amount of force when effecting the seizure"). "Excessive force" is a stand-alone claim to be examined independently of any claim relating to the stop/detention. In this case, there are factual disputes as to whether, as James Smoak claims, he was wrestled to the ground by the troopers (resulting in physical injury) when he reacted to the shooting of his dog. Therefore, with respect to Section II D of the Opinion, I concur in Judge Gilman's affirmance of the district court's denial of qualified immunity to Andrews and Bush on this claim.

It is equally well-established that citizens have a right "to be secure in their persons . . . against unreasonable . . . seizures[.]" U.S. Const. amend. IV. Although the law recognizes circumstances under which "police officers are permitted to conduct a limited type of seizure--the 'investigatory stop'--in the absence of probable cause[ ]" (Maj. Op. at 6), any such seizure must be "sufficiently limited in scope *and duration* to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (emphasis added); *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005) ("The 'scope of the intrusion permitted' in the course of a *Terry* stop 'will vary . . . with the particular facts and circumstances of each case,' but in all cases the 'detention must be temporary and last no longer than is necessary' and 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.' ") (quoting *Royer*).

Based on this articulation of the law, I must dissent with respect to the reasoning and the result of Section II C of the Majority Opinion. The majority concludes that, although the "troopers had a reasonable suspicion sufficient to conduct a *Terry* stop[,]" (Maj. Op. at 8) "the seizure of the Smoaks violated their Fourth Amendment rights because it became an arrest without probable cause." (Maj. Op. at 10). Even so, the majority ultimately concludes that this "was not so clear to the THP troopers on the scene as to deny them qualified immunity on this basis." (Maj. Op. at 10).

I agree completely that the troopers made a legitimate *Terry* stop. I disagree as to what events are included in this legitimate stop. I have viewed the audio/video recording made by the device attached to the trooper's vehicle. Although the first several minutes of the stop, during which the Smoaks were ordered out of their car and handcuffed and their dog was killed, may be unfortunate in hindsight, I cannot agree with the majority that what happened between 17:18 (when the Smoak's car was pulled over) and 27:35 (when one of the troopers finally learned from dispatch that there actually were no reported robberies), constituted an "arrest without probable cause." (Maj. Op. at 10). Even though I might have preferred that the troopers act somewhat differently, I conclude that their actions during that approximate 10-minute time frame comported with the law.

Where I would draw the line is at 27:35, the time when the troopers learned they had no further reason to hold the Smoaks and yet failed to immediately remove their handcuffs and release them. At that moment, what had been a legitimate investigative stop turned into an arrest without probable cause. Since it cannot factually be determined from the record which of the troopers was involved in these events, that should be a fact call for a jury. It matters not one iota that the duration of this illegal seizure was only about nine minutes. This has to be actionable behavior and there is

no question in my mind that there is no qualified immunity with respect to this narrow portion of the events on the videotape.

Therefore, although I agree with the majority's *conclusion* that there was an arrest without probable cause, I would find that the unlawful arrest occurred at approximately 27:35 and lasted until approximately 36:48. Furthermore, I would not grant qualified immunity as to the events within this narrow window of time because every reasonable officer would know that, as soon as lack of probable cause was verified, the detention should have stopped immediately.

I concur in the background statement set forth in Section I. I concur in the statement of the law set forth in Sections II A and B. I concur only in the result reached in Sections II D and E. I concur in part and dissent in part as to Section II C. To the extent Section III conflicts with my conclusion, I do not join Section III.