**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0602n.06

Case No. 19-5096

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Dec 09, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| TAVARES L. FARRINGTON, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GRIFFIN, STRANCH, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This case deals with whether firearm evidence discovered during the stop and frisk of Tavares Farrington ("Farrington") at his workplace, MTD Products ("MTD"), should have been suppressed. On the night of March 22, 2017, Joseph Clark ("Clark"), a supervisor in the human resources department at the MTD plant, called the Martin, Tennessee, Police Department and reported that another MTD employee had reported to him that Farrington might be in possession of a firearm on the plant floor. Officers were called to respond and, after briefly speaking with Clark at the human resources office, followed Clark to the plant floor to confront Farrington. Farrington failed to provide a straightforward answer when questioned about whether he possessed a firearm, and the officers conducted a pat-down search of the exterior of Farrington's clothing, finding a pistol in his right-

front pocket. Farrington filed a motion to suppress the evidence obtained from the officers' pat-down, but the district court denied his motion. Farrington now appeals the district court's denial of his motion to suppress. For the reasons below, we **AFFIRM**.

I.

The facts of this case are drawn from Clark's 911 call and body cam footage from the responding officers. Around 9:00 P.M., Clark called the Martin Police Department and identified himself as Joseph, an employee at MTD Products. Clark then asked the dispatcher if they could have an officer come out to the plant to investigate "an individual in the plant possibly possessing a firearm." Clark informed the dispatcher that the individual, later determined to be Farrington, "may have a beef with someone inside the plant." When pressed for more information, Clark told the dispatcher that he was with "a gentleman that had spoken [to Farrington] and that he was trying to find out what [Farrington] looks like." The dispatcher attempted to further clarify whether Farrington had actually "made any threats," to which Clark responded that "[Farrington] thinks some people are talking about him, and there is a guy that works across from him, and [Farrington] asked him if he thinks he could see a firearm on him." Clark explained that the employee whom Farrington had asked, Traevon Atkins ("Atkins"), was currently with him in the human resources office.

Over the course of the call, Clark relayed Atkins' responses as to Farrington's race, height, age, attire, and distinguishing features (Atkins can be heard in the background throughout the call). Neither Clark nor Atkins, however, were able to provide the dispatcher with Farrington's name. The dispatcher confirmed that Farrington was still working "on the line" and informed Clark that officers were on their way to the plant.

Officers Marty McClue, Kerry Workman, and Trae Vaughn (collectively "the officers") arrived at MTD at approximately 9:10 P.M. Clark greeted the officers and informed them that Atkins "smells like he is reeking of weed" and that "[Atkins] is the one who [came] in and let [him] know that there is a guy on the line carrying, supposedly, a pistol on him." He then explained to the officers that he had not "confirmed [Atkin's account] at all" up to that point. Clark informed the officers that the reason Farrington may have a firearm was that "he thinks people are making fun of him on the line . . . and he is getting kind of pissed off."

Clark then escorted the officers into the human resources office where an unnamed MTD employee quickly ascertained Farrington's name and additional identifying details. Although Atkins was seated next to the officers in the office, they did not ask him any questions or attempt to confirm any of the information provided by Clark or the dispatcher. Atkins appeared somewhat startled by the officers' presence, jokingly stating, "I didn't do nothing I promise," but his demeanor throughout the video showed no signs of impairment, and he offered substantial information which aided in identifying Farrington.

After reaching a consensus as to Farrington's location in the plant, Clark suggested potential approaches to confront Farrington. Officer Vaughn proposed that, "[the officers] can just go with and ask and see if [Farrington] has a firearm, we can check a couple guys if you want—it's not a problem."[1] Clark then led the officers to the plant floor. Clark approached Farrington first, but no recording picked up their brief conversation amidst the noise from the plant floor. Officer McClue then asked Farrington, "do you have a firearm on you?" Farrington offered several different responses as the question was repeated to him, each time neglecting to answer and generally pleading ignorance. Having reached an impasse, Officer McClue conducted a pat-down

---

[1] While this statement is certainly problematic, once on the plant floor, Farrington was quickly identified by Clark, and no other employees were searched by the officers.

of the exterior of Farrington's clothing and recovered a pistol from Farrington's right-front pants pocket. The officers also found a prescription pill bottle in Farrington's possession, later determined to contain crack cocaine. The officers handcuffed Farrington and escorted him out of the MTD plant.

On April 17, 2017, a federal grand jury returned a one-count indictment charging Farrington with knowingly possessing a firearm after having been previously convicted of a felony pursuant to 18 U.S.C. § 922(g)(1). Farrington filed a motion to suppress the firearm evidence, but the district court denied his motion. Farrington's motion for reconsideration was denied as well. On January 25, 2019, Farrington entered a conditional guilty plea, reserving the right to appeal the district court's adverse ruling regarding his motion to suppress. He was sentenced to 188 months' imprisonment. Farrington now appeals the district court's denial of his motion to suppress.

II.

We review a district court's denial of a motion to suppress under a mixed standard of review, analyzing its conclusions of law de novo and its findings of fact for clear error. *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011) (citing *United States v. Henry*, 429 F.3d 603, 607 (6th Cir. 2005)). "In so doing, we consider the evidence in the light most favorable to the government." *Id.* at 565-66 (citing *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)).

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). In *Terry v. Ohio*, the Supreme Court determined that it is reasonable for police officers, absent probable cause, to conduct a

limited type of seizure—an investigatory stop. 392 U.S. 1, 30 (1968). An investigatory stop, commonly known as a *Terry* stop, can be conducted

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment . . . .

*Id.* at 30-31. Officers may reasonably conclude the forthcoming of criminal activity when they observe conduct raising their "reasonable suspicion[s]." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion, not unlike probable cause, remains an abstract concept:

> It requires more than just a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts[,] he may conduct a *Terry* stop.

*Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006) (internal quotations, citations, and ellipsis omitted).

In addition to the reasonableness of an officer's suspicion, "[t]he manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry." *Terry*, 392 U.S. at 28. The level of intrusion into the suspect's privacy must be reasonably related to the scope of the officer's suspicions given all surrounding circumstances. *Smoak*, 460 F.3d at 779. Because Farrington does not challenge the manner of his brief seizure and pat-down, we need only assess whether the officers had a reasonable suspicion to perform a *Terry* stop.

III.

To succeed in having the district court's denial of his motion to suppress overturned, Farrington must show that the officers lacked reasonable suspicion that he was engaging in criminal activity. "The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under *Terry*." *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003). Officers must consider all the information available to them and are not limited to direct observation; reasonable suspicion can be based on a tip from an informant or information provided to officers by the police dispatcher. *Smoak*, 460 F.3d at 779 (citing *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998)). We assess the circumstances before the officers using "a common sense approach, as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citation omitted).

In this case, the district court cited the following reasons in support of its holding that the officers had reasonable suspicion to stop and frisk Farrington: (1) Clark provided information to the police dispatcher through the 911 emergency system, including his name, location, employment position, and details as to why he believed Farrington may have a firearm; (2) the officers met Clark in person and were able to corroborate certain details of Atkins' story, such as Farrington's appearance and location in the plant; and (3) the officers were able to personally observe Atkins demeanor and had no reason to question his credibility. Farrington asserts that the officers never had reasonable suspicion because they failed to question Atkins, essentially relying on an anonymous tip. We disagree.

Before deciding whether the officers possessed reasonable suspicion, we must define the scope of our analysis. First, "reasonable suspicion . . . requires that a tip be reliable in its assertion

of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Therefore, confirmation of Farrington's identifying information (race, height, build, and clothing) from the dispatcher and again at MTD's human resources office does not itself provide reasonable suspicion of illegality.

Second, Farrington does not and cannot dispute that, if the officers indeed had reasonable suspicion that he possessed a firearm, they could stop and frisk him. Carrying a concealed handgun is illegal in Tennessee. *See* Tenn. Code Ann. § 39-17-1307(a)(1) ("A person commits an offense who carries, with the intent to go armed, a firearm . . . ."). Although the statute provides several defenses permitting concealed carry of a handgun, none of these are applicable to Farrington. *Id.* at § 39-17-1308(a).

Third, several of Farrington's arguments are irrelevant to the determination of the officers' suspicions. Farrington claims that he never mentioned having a firearm, but instead asked Atkins, "if it looks like I have anything on me." Farrington further contends that a different employee (not Atkins) initially reported the exchange to human resources. Even if true, neither claim is pertinent to our analysis. The only relevant information is what was known to the officers at the time of the stop. The responding officers had no knowledge that Farrington's statement to Atkins may not have included any word synonymous with "firearm" or that Atkins, himself, had not tipped off human resources. Therefore, they do not enter our review. Moreover, officers are not under a continuing duty to confirm the information provided to them or rule out the possibility of innocent conduct if the circumstances available to them have already raised their reasonable suspicions. *Navarette v. California*, 572 U.S. 393, 403-04 (2014) (citing *Arvizu*, 534 U.S. at 277 (2002)).

Finally, despite Farrington's insistence to the contrary, this case is not an anonymous tip case, which would require considerably more facts and support from the informant for the officers

to develop reasonable suspicion.[2] *See, e.g.*, *J.L.*, 529 U.S. at 270. Clark, a supervisor at the MTD plant, called 911 and identified himself to the dispatcher. He explained that Atkins, who was with him during the call, was the individual to whom Farrington's question was addressed. This information was then relayed to the officers.[3] When the officers arrived at the plant, they met with Clark to discuss the situation, remained in the human resources office to identify Farrington, and although they never asked any questions of Atkins, they were in his presence, thereby confirming his identity as the first-hand source of knowledge regarding Farrington. Neither Clark nor Atkins was anonymous to the officers.

Accordingly, our inquiry is narrowed to the sole question of whether the officers had reasonable suspicion that Farrington possessed a firearm at the time of the pat-down given the totality of the information available to them. In view of these bounds, it is clear the circumstances here reached the necessary cross-section of reliability and quantum of evidence to arouse reasonable suspicion.

As discussed above, the officers acted on reasonably reliable information. They verified Clark's and Atkins' identity in person shortly after the alleged conversation between Atkins and Farrington took place. "[A]n in-person informant's proximity in time and space to the reported criminal activity indicates the reliability of the tip, because it reflects that the informant acquired the information firsthand." *Henness*, 644 F.3d at 318. Although Clark indicated to the officers that Atkins "reeked of weed," Atkins demeanor in the officers' presence failed to show any signs

---

[2] "There is a difference . . . between anonymous tips provided over the telephone and those given face-to-face with a police officer. An in-person tip gives the officer an opportunity to observe the informant's demeanor and credibility. The in-person informant risks being held accountable for false information." *Henness v. Bagley*, 644 F.3d 308, 318 (6th Cir. 2011) (internal citations omitted).

[3] For purposes of determining the reasonableness of a *Terry* stop, information relayed from the police dispatcher is imputed to the individual officers. *Feathers*, 319 F.3d at 849; *see also United States v. Hensley*, 469 U.S. 221, 232 (1985) (holding that officers can make a *Terry* stop in objective reliance on a flyer or bulletin if the police who issued the flyer or bulletin had a reasonable suspicion justifying the stop).

of intoxication or provide any reason for the officers to question his story. Clark's and Atkins' accounts were reliable enough for the officers to develop a reasonable suspicion that Farrington possessed a firearm.

Furthermore, the information provided by Clark was substantial and showed a significant likelihood—more than enough to form a reasonable suspicion—that Farrington was armed and dangerous. Clark told the dispatcher that Farrington had asked another employee whether he could see a firearm on him, and that Farrington may be in possession of a firearm because he was having problems with some of his coworkers. When the officers arrived, Clark further explained to them that Farrington thought his coworkers had been making fun of him. Finally, Farrington did nothing to dispel the officers' suspicions; when asked whether he possessed a firearm, he repeatedly declined to answer the officers' or Clark's questions. These circumstances constitute "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] th[e] intrusion." *Terry*, 392 U.S. at 21. Because the officers developed a reasonable suspicion that Farrington possessed a firearm and posed a potential threat to the safety of others before they patted him down, Farrington's Fourth Amendment rights were not violated.

For the foregoing reasons, we **AFFIRM** the district court's denial of Farrington's motion to suppress.