Eric TAPP, Plaintiff–Appellant,

v.

David L. BANKS, et al., Defendants–Appellees.

No. 99–6563.

United States Court of Appeals, Sixth Circuit.

Jan. 10, 2001.

Before DAUGHTREY and MOORE, Circuit Judges, CLELAND,* District Judge.

CLELAND, District Judge.

Appellant Eric Tapp challenges the dismissal of his civil rights lawsuit by the district court. He asserts that the district court improperly granted summary judgment on the issues of excessive force and the denial of adequate medical care.[2] We find that the district court properly granted summary judgment on Tapp's Eighth Amendment claim, but that the court did not give adequate consideration to the facts presented in Tapp's testimony which, if accepted by a jury, could lead to a determination that excessive force was used in subduing Tapp and taking him into custody. Thus, we will affirm in part and reverse in part the district court's judgment.

## I. Background

At approximately 3 a.m. on April 20, 1997, Tapp stopped his vehicle at a convenience store in Prestonsburg, Kentucky, and yelled the following alarming statement to three police officers: "You better do something! They already taken over Lexington and Louisville, and they're coming this way. They're holding the line at Clay City." When police officer Stephen Parker told Tapp to wait, Tapp shouted "Go ahead and act like an idiot. You better do something!" Tapp then sped away.[3]

---

* Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

2. These are the only two issues before the court. Appellant in his brief stated that "[i]n the Notice of Appeal, the Appellant has raised various state causes of action, and claims against Danny Webb and Gary Rose in their official and individual capacities. The Appellant chooses not to address the [c]ourt's

granting of [s]ummary [j]udgment on any other claim not aforementioned."

3. Tapp averred that, before he sped away, he also told the police officers that central Kentucky was being depopulated, that 300,000 people were missing, that the place smelled like honeysuckle, and that "when they gassed the subway system in Japan that was like what xenon gas smells like...."

Believing that Tapp was either intoxicated or mentally ill, the police officers began to pursue him. These officers also radioed a report into a dispatcher for the Kentucky State Police, and Appellee David Banks was one of the officers who received the call. Even though he was off duty, he decided to respond to the call because the pursuit was heading in his direction. Banks does not appear to have been apprised of the contents of the statements uttered by Tapp.

Thereafter, Banks saw Tapp's truck with several police cruisers following it. Banks pulled directly behind Tapp's truck and became the lead vehicle in pursuit. Tapp led the police officers in a harrowing pursuit lasting approximately thirty-three minutes and with speeds of eighty, and at times more than one hundred, miles an hour. During this pursuit, Tapp drove through a "rolling road block" and a line of road block flares, and he used both sides of the highway to maintain control of his truck as he made turns at high speeds. Within Banks's view, Tapp at one time rammed a police cruiser, forcing it out of control and spinning into the opposite lanes of travel (which, fortunately, at that hour were deserted).

After about forty-five minutes of this pursuit, Tapp suddenly pulled over to the side of the road near the Perry County–Breathitt county line. Banks braked to a spinning stop and left his cruiser so fast that the lights and siren were still activated; no other officers were as yet on the scene. Tapp and Banks were therefore the only witnesses to the next few minutes and to Banks's use of force in taking Tapp into custody. They disagree about the events that followed Tapp's exit from the truck. In his deposition, Tapp stated as follows:

That's when—I guess it was one of the first guys that was—that started the pursuit in my opinion. He was about my build, maybe weighed 40 or 50 pounds more and had a burred haircut, of course. And so he comes out and he pulls out his gun, tells me to turn around and face the other way. So I face the other way, sticks the gun right here to the back of my head, tells me to get down on my knees. So I got down on my knees, the whole time keeping my hands behind my head, and then he told me to put my face on the ground, so I did and he said I'm going to blow your fucking brains out, word for word, that's exactly what he said.

\*     \*     \*     \*     \*     \*

After he said that, I—he—I thought, God, no, flashed through my mind. I don't even know why. I felt the gun came back off my head, and the next thing I know, somebody—weight was applied or force was applied to my rear end and pushed me over to—pushed me off balance. So I'm still face against the pavement, pushed to the side and that exposed my knee because I was still trying to—still doing what they say. And about that time, I start getting beat on the left knee with either a flashlight or a billy club. It's my impression it was a billy club. I don't hear no light bulbs rattle when he beat me. So they hit me about three or four times before I could get my—shift my weight back over and put my arm to cover my knee, and I got hit once, at least once in my arm. But when I did that, that exposed this knee. Oh, well, it's three or four times there, too, so go back over and try to cover that knee and, of course, I'm getting hit in the arms but it's better than getting hit in the kneecaps, and so I go back over to cover that knee. Well, that exposed that one again, so they beat that one about two or three times probably, and on the third time I heard

it pop. About the time I heard it pop, I heard someone else like footsteps behind me and that's when I got smacked across the top of the skull and left a—I had a gash—I have a scar about this long on the top of my head and I guess I was pretty much out then.

Tapp averred that he did not strike any police officer; instead, he stated that he got down on his knees, faced the ground, put his hands on his head, and took a beating. Overall, Tapp estimated that he was hit twelve to fifteen times.

During his deposition, Banks provided a considerably different version of the events in question, stating:

A: Exited my SP, my cruiser, brought my ten (10) millimeter out, saw him jumping around, swinging his arms, jumping up and down, waving them, I screamed "Let me see your hands, Let me see your hands[."] I saw his hands, I re-holstered. At that time he approached me running, swinging his arms. About as far as from me to you is when he took a swing at me with his right arm, and then he hunkered down, was running at me, and that's when I struck him with my flashlight.

\* \* \* \* \* \*

Q360: Where did you strike him?

A: In the head.

Q361: What part of the head?

A: I believe, I don't remember, somewhere around the forehead.

Q362: Did he say anything when you struck him?

A: The siren was still going, I don't know.

Q363: Where did—what happened when you struck him in the head?

A: He fell backwards on the roadway, kind of on his right side, stumbled backwards and fell.

Q364: OK, what did you do?

A: Went towards him and he come up with his left leg and trying to kick me in the groin area.

Q365: He was down on the ground?

A: He was down on the ground trying to kick, well he was kicking at me.

Q366: Alright, he was on the his right side on the highway?

A: Right.

Q367: Kicking up at you with his left leg?

A: Right, kind of on his back, more on his right side then (sic) he was his left.

Q368: OK, so he was not moving towards you at the time?

A: Just his left leg was.

Q369: And what was his right leg doing?

A: I wasn't paying any attention to his right leg.

\* \* \* \* \* \*

Q371: OK, when I last was talking to you, Trooper, we were talking about him kicking with his left leg, and I think you told me but I can't recall, how many times did he kick out at you?

A: I don't know, but I stuck him what I believe to be was, from my memory was three (3) times, each time I was responding to his kick. Kicked, I struck him in the left leg, kicked again, I struck him again, I believe it was three (3) times, no more than three (3).

Q372: You struck him with what?

A: My flashlight, after the last time I struck him my light glanced off of his leg and rolled down the highway. I lost control of my light and didn't have any light. He continued to kick me, I blocked the kick with my arm, and I come down on top of him and

that's when the wrestling occurred for a few moments.

After Tapp was arrested, he was taken to Appalachian Regional Hospital to be examined. He claims to have asked the hospital to examine his knee, but says the request was denied. Instead, the doctors at the hospital sutured Tapp's facial cuts and took many x-ray examinations.

After a few hours at the hospital, Tapp was taken to the Perry County Jail for booking. He remained at the jail for approximately twenty days[4] before being transferred to Eastern State Hospital where he was diagnosed with bi-polar disorder. Several days thereafter, while still at the State Hospital, it was discovered that Tapp had a fractured patella. He underwent surgery for his patella at the University of Kentucky Medical Center.

## II. Standard

The court reviews *de novo* the district court's decision to grant summary judgment. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (citing Fed.R.Civ.P. 56(c)). When viewing the evidence, the court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## III. Discussion

On October 21, 1999, the district court granted defendants' motion for summary judgment. It found, among other things, that (1) "the actions taken by Defendant Banks cannot be classified as excessive force in light of the chaos that had just ensued" (Oct. 21, 1999 order at 8), and (2) "the defendants did not act with deliberate indifference in failing to detect and provide treatment of Plaintiff's knee injury" (Oct. 21, 1999 order at 17). Tapp asks this court to reverse these findings.

### A. Excessive Force[5]

In its order of October 21, 1999, the district court concluded, *inter alia*, that Tapp's claim pursuant to 42 U.S.C. § 1983 must fail because Banks was entitled to qualified immunity.

Government officials, including police officers, performing discretionary functions are entitled to qualified immuni-

---

**4.** The actual number of days is not entirely clear.

**5.** In the complaint, Tapp asserted the following claims against Banks: (1) 42 U.S.C. § 1983; (2) 42 U.S.C. § 1985; (3) First Amendment of the United States Constitution; (4) Ky.Rev.Stat. Ann. § 503.090; (5) unlawful imprisonment and malicious prosecution; (6) tort of outrage; and (7) §§ 1 and 2 of the Kentucky Constitution. In light of Tapp's de-

cision to challenge only the excessive force issue under § 1983, the district court's decision as to the other claims stands. Also, as noted in footnote one, Tapp has declined to challenge the district court's order granting summary judgment on the excessive force claim against Gary Rose and Danny Webb. Thus, the district court's order as to these parties is not before us.

ty from civil suits for damages arising out of the performance of their official duties "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The key inquiry in analyzing a claim for qualified immunity is whether the defendant's alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994). Thus, in order to defeat a qualified immunity defense, the plaintiff must (1) allege that a violation of a clearly established law occurred and (2) present sufficient evidence to create a genuine issue as to whether the defendant in fact committed the acts that violated the law. *Id.*

Tapp has satisfied the first part of this test because "both the right to be free from unreasonable seizures and to be free from the use of excessive force under the Fourth Amendment are clearly established." *Id.* at 386–87 (internal citations omitted). Thus, the only question remaining is whether Tapp has presented sufficient evidence to create a genuine issue as to whether Banks violated his Fourth Amendment rights.

The court must use the standard of objective reasonableness to determine if the "official knew or reasonably should have known that his or her particular conduct would not pass scrutiny when applied to the law." *Sandul v. Larion,* 119 F.3d 1250, 1254 (6th Cir.1997) (internal citations omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Martin v. Heideman,* 106 F.3d 1308, 1312 (6th Cir.1997) (quotation marks and citation omitted).

In finding that Banks was entitled to qualified immunity, the district court stated that "[w]hile Defendant Banks was approaching him on foot, Plaintiff exited his vehicle and began flailing his arms erratically. Plaintiff continued to fight his arrest even after he was placed on the ground." (Oct. 21, 1999 order at 8.) The district court's recitation properly summarizes Banks's version of the events, and correctly notes that the surrounding circumstances (including here an extraordinarily dangerous forty-five minute high-speed chase through the fog occasioned by Tapp's irrational behavior) must be considered when weighing the reasonableness of the officer's actions. We cannot locate, however, any indication that the district court considered the countervailing deposition testimony given by Tapp as to the events at the conclusion of the chase, even though Tapp's deposition testimony was specifically cited in the response brief to Banks's motion for summary judgment. It may be that the district court discounted the version of the events given by Tapp, although this is not clear from the district court's statement. It is our conclusion, in any event, that the district court did not hew to the requirement of Rule 56(c) that, "[w]hen viewing the evidence, the court must draw all reasonable inferences in favor of the non-moving party." *Matsushita,* 475 U.S. at 587.

In *Kain v. Nesbitt,* 156 F.3d 669 (6th Cir.1998) the Sixth Circuit, through Judge Ralph B. Guy, Jr., noted the analytical difficulties commonly encountered during both Rule 12 and Rule 56 qualified immunity examinations:

When making a qualified immunity analysis [under Rule 12(b)(6) ], it is important to remember that the defendant is, in essence, saying: "If the plaintiff's ver-

**350**

sion is credited, what I did, judged today, arguendo would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully."

156 F.3d at 671.

The *Kain* court later discussed the Rule 56 analysis and used an example of a plaintiff who claimed that

the excessive force consisted of the defendant intentionally and maliciously handcuffing her so tightly that she lost circulation in both her wrists and suffered physical injury, then the qualified immunity analysis would have to be made. Part of the analysis would be a determination as to whether there were any genuinely disputed questions involving material facts. It would matter not, for example, that the officer denied handcuffing her tightly. This would merely generate a genuinely disputed question of fact, which is for the trier of fact to resolve, not the judge. This would be true notwithstanding that the trial judge found the officer to be more credible than the plaintiff, because it is not for the court to make credibility determinations at this stage of the proceeding.

156 F.3d at 672.

At this point, in footnote 5, the *Kain* court expanded upon the notation that credibility determination is not for the court in a summary judgment analysis:

The confusion in this area is generated in part by carrying over an absolute immunity construct into a qualified immunity analysis. When an official is cloaked with absolute immunity, it matters not what he did, when he did it or what the state of the law was then and now. Such is not the case with qualified immunity.

156 F.3d at 672 n. 5.

If Tapp's evidence had been viewed under the proper standard, the district court would have found the existence of a genuine issue of material fact. In his deposition, Tapp provided testimony that, although not the clearest or most cogent, fundamentally disputed Banks's allegation that he had physically fought and resisted Banks's attempt to arrest him. Instead, Tapp contended that he was hit twelve to fifteen times despite following Banks's instructions to put his face and knees on the ground.

While it is objectively reasonable that an officer would be both agitated and highly apprehensive after a dangerous, lengthy high-speed pursuit such as this, it is not objectively reasonable for an officer dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times[6] in the absence of resistance. Viewing the evidence in the light most favorable to Tapp and rejecting the evidence proffered by Banks, which the court must do for this analysis, a finder of fact could

**6.** In both briefing and at oral argument. Tapp's counsel emphasizes the imagined *force* of the blows rather than their numerosity as though that should make a difference; this is exemplified by counsel's apparent amazement that the officer at one point lost his grip on the flashlight and saw it roll away down the road. In this case, at least, we do not think this argument is particularly noteworthy. If the situation determined by the finder of fact is as Banks recalls it, then Tapp was repeatedly and violently attempting to kick and per-

haps to injure Banks, clearly identified as an officer and obviously demanding compliance with his order to submit to arrest. Under *those* facts, we think that few observers would be startled at the prospect of an officer meeting force with force, continuing to strike the person's legs both defensively and in an attempt to persuade the person to stop That one of the blows might fracture an exposed bone such as the kneecap, under the circumstances described by Banks, would likewise not seem remarkable.

conclude that Tapp had suddenly decided to "surrender" after giving up the chase and was thereupon "punished" by an officer in retaliation for running and endangering citizens and other officers.[7] Such actions by an officer would offend the Fourth Amendment and would not be saved by a qualified immunity analysis. Thus, a genuine issue of material fact exists as to whether Tapp's Fourth Amendment rights were violated. Tapp's excessive force claim should have survived, and we will remand this claim to the district court for further proceedings consistent with this opinion.

### B. Medical Care

Tapp contends that the district court erred when it dismissed his claim of inadequate medical care for his fractured patella. He asserts that sufficient evidence was presented to the district court showing that the jail staff knew about his patella and that the jail staff's ensuing inattentiveness about his medical needs created a genuine issue of material fact.

█ In order to prevail on this claim, Tapp must show that Appellees Perry County Jail, Sherman Neace, Mac Feltner, Denny Ray Noble, Freddy Combs, and Johnny Blair (hereinafter collectively referred to as "jail defendants") displayed a deliberate indifference to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)

("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (internal citation omitted)). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Williams v. Mehra,* 186 F.3d 685, 691–92 (6th Cir.1999) (en banc). Thus, the deliberate indifference analysis has two components.

> The first one is an objective one: Was the deprivation sufficiently serious?
>
> The second has a subjective element: Did the official act with a sufficiently culpable state of mind?

*Durham v. Nu'Man,* 97 F.3d 862, 869 (6th Cir.1996).

█ The district court concluded (1) that, although Tapp's injury was serious, it was not obvious and (2) that the jail defendants did not act with the sufficient culpable state of mind. Robert P. Goodman, M.D., an orthopedic surgeon who conducted an independent medical evaluation of Tapp, testified as follows:

---

7. We cannot know, of course, whether a finder of fact would chose to agree with Tapp's contrary version, but if they do, it would not be an unwarranted or novel conclusion. The concept of "street justice" exacted by officers on the scene is well-known *See, e.g.,* Coramae Richey Mann, *Unequal Justice: A Question of Color* 139 (1993); *see also* Derrick Bell, *Race, Racism & American Law* 288–416 (3d ed.1992); George L. Kelling, *Order Maintenance, the Quality of Urban Life, and Police: A Line of Argument, in Police Leadership in America* 296 (William A. Geller ed., 1985).

Carl B. Klockars, *Order Maintenance, the Quality of Urban Life, and Police: A Different Line of Argument, in Police Leadership in America, supra,* at 309; Carl B. Klockars, *Street Justice: Some Micro–Moral Reservations: Comment on Sykes,* 3 Just. Q. 513 (1986); Gary W. Sykes, *Street Justice: A Moral Defense of Order Maintenance Policing,* 3 Just. Q. 497 (1986); Gary W. Sykes, *The Functional Nature of Police Reform. The "Myth" of Controlling the Police,* 2 Just. Q. 51 (1985).

Q13 This fracture that he had, Dr. Goodman, assuming Mr. Tapp was taken to the Perry County Jail following booking and his examination at the Hazard ARH, would this fracture be something that the jail personnel would have detected, or can this fracture be something that can occur and you not even know it for a period of time?

A Well, no. Jail personnel really wouldn't be expected to—to notice it. And you can have it—you can walk with the fracture because—well, if this is the kneecap, it's surrounded by all these ligaments that partially hold it together. In other words, if you—and I think he has—this is the underside of the kneecap. I think he had—where he broke it was this, across the kneecap, but if it's not pulled apart very much then you can walk on it even though the crack is through there and the ligaments hold it. So you—you would probably have some pain, but other people would—really wouldn't notice it, no.

He further stated that, even if the jail personnel saw swelling in the knee, they would not know if Tapp suffered a bruise or a fracture because a swelling could occur with either one of them.

Tapp has not challenged Goodman's testimony. Instead, he claims that "[t]he actions of Everett Feltner, the [a]ffidavits of Delores Segress and Robin Webb clearly establish the knowledge of the jail staff and their inattentiveness to the Appellant's serious medical needs."

We disagree. First, Tapp's argument about the relevance of Feltner's actions is not compelling. While Feltner gave crutches to Tapp because there was something wrong with Tapp's leg, he did so because Tapp refused to go to a doctor.

Moreover, Feltner's actions are not indicative that the jail personnel had reason to believe that Tapp's patella was broken; instead, they merely indicate that Tapp was in pain and Feltner attempted to accommodate him. The jail personnel do not dispute that Tapp suffered some pain. They do contend, however, that they did not know the extent of the injury because of (1) the inaccurate diagnosis by Appalachian Regional Hospital and (2) Tapp's failure to seek medical assistance.

Second, Delores Segress's affidavit, at best, presents a scintilla of evidence in support of Tapp's claim. Segress, Tapp's mother, stated, among other things, that she told a deputy at the jail that Tapp needed medical assistance. Two days after this request was made, Tapp was sent to Eastern State Hospital for medical attention. Thus, the jail defendants provided Tapp with prompt medical assistance after such assistance was requested.

Third, despite Tapp's assertions to the contrary, Robin Webb's affidavit actually supports the jail defendants' position. In her affidavit, Webb described Tapp's physical condition shortly after his arrest, stating, among other things, that

I inquired as to the nature and extent of his injuries, other than those visible. Mr. Tapp took off his shirt off, exposing the area where he was bruised on the back in the vicinity of his ribs and above the hips. Mr. Tapp raised his loose-fitting pants and his knee was bruised and swollen to the estimated three times the size of the other knee. . . .

Since the inmates at the Perry County Jail are imprisoned wearing their own clothes, this affidavit highlights that the condition of Tapp's knee was not visible to the jail defendants, and thus they could not have inferred the seriousness of his injury.

Finally, Tapp contends that his request for medical assistance was ignored by the jail defendants. While Tapp asserts that "it is clear that [he] requested medical assistance from [the jail defendants]", his deposition testimony indicates that he was, and still is, confused about this issue:

Q. Had you requested anybody at the jail to get any assistance for your knee?

A. I mentioned, you know, they knew I couldn't walk. They kept me in insolation for this area.

Q. My question is, did you ask anybody at the jail to get you medical assistance for your knee?

A. They were aware that I thought this was broken and I did let them know that this hurts and that I'm in pain, and that's it.

Q. You just told them that your left knee hurt and you were in pain?

A. Yeah, and I also told them that—I told them that at the hospital and they totally neglected it.

Q. Mr. Tapp, my question is, did you ask anybody at the jail, jail personnel to bring you any type of medical care or assistance for your left knee or injuries?

A. No, I didn't order them around.

Q. Is the answer no?

A. I informed them. Is that the same as telling them to?

Q. Did you ask anybody at the jail, any jail personnel to bring you any type of medical care or assistance for any of your injuries?

A. I personally did not, but I did inform them as to the—to my physical condition.

Thus, while it appears that Tapp told jail personnel about his pain, he presented insufficient evidence to refute the jail defendants' assertion that he never sought medical assistance. We therefore will affirm the district court's order concluding that Tapp was not deliberately deprived of adequate medical care.[8]

## IV. Conclusion

Based on Tapp's testimony, there exists a genuine of material fact as to whether Banks violated Tapp's Fourth Amendment rights. Tapp, however, has failed to demonstrate a genuine issue of material fact as to whether the jail defendants deliberately deprived him of adequate medical care. The court accordingly REVERSES in part and AFFIRMS in part the district court's order granting summary judgment, and REMANDS the case to the district court for further proceedings consistent with this opinion.

---

8. Additionally, it appears that Tapp's deliberate indifference claim against the jail defendants, excluding Perry County Jail, must fail because these defendants are apparently sued in their supervisory role and Tapp has not asserted a faulty policy or custom or that the actual jail personnel followed such policy or custom.