NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  09a0628n.06

Case No. 08-5442

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Sep 02, 2009**
LEONARD GREEN, Clerk

| | |
|---|---|
| JAMES W. SMOAK, *et al.*, | ) |
| Plaintiffs-Appellees, | ) |
| v. | ) |
| ERIC HALL, *et al.*, | ) |
| Defendants, | ) |
| and | ) |
| DAVID BUSH, | ) |
| Defendant-Appellant. | ) |

**On Appeal from the United States District Court for the Middle District of Tennessee**

BEFORE:  BATCHELDER, Chief Judge; COLE, Circuit Judge; and LAWSON, District Judge.[*]

ALICE M. BATCHELDER, Chief Judge.  David Bush, one of the police-officer defendants in this 42 U.S.C. § 1983 action claiming use of excessive force, appeals a jury award for the plaintiffs.  Bush contends that the district court erred by denying his motions for judgment as a matter of law and qualified immunity.  For the reasons that follow, we AFFIRM the judgments of the district court.

**I.**

On January 1, 2003, James Smoak, his wife Pamela Smoak, and Pamela's 17-year-old son Brandon Hayden (hereinafter referred to collectively as the "Smoaks"), were traveling home to North

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

Carolina in their green Mercury station wagon after spending New Year's Eve in Nashville. Their two young dogs, General Patton and Cassie, were also in the car. After stopping at a gas station to refuel, James Smoak accidentally left his wallet on the roof of the car and drove off.

Almost immediately thereafter, at approximately 4:40 p.m., one Veronica Louwien called the Tennessee Highway Patrol (THP) and spoke to dispatcher Shannon Pickard, exclaiming:

> "I'm driving down Interstate 40 in Wilson County [Tennessee], going towards Lebanon. I passed the Mt. Juliet Exit, and a car passed me. It was kind of like a station wagon. It was dark green. It was probably going 110 miles an hour. And then not too far in front of me, there was money flying all over the interstate . . . ."

Pickard dispatched THP troopers to meet Louwien at the scene and recover the money.

A short time later, those troopers reported back to Pickard that they had reached the scene and had indeed found loose currency in the median (they did not, at that time, inform Pickard of the actual amount, which turned out to be $445). Pickard contacted local law enforcement, including police dispatchers in the City of Cookeville, Tennessee, and told them to look for a green station wagon traveling at a high rate of speed. Pickard also sent out a teletype to all area law enforcement, inquiring if a "recent robbery" had occurred, possibly involving a green station wagon.

Pickard admits that some time later — after he had been informed that the amount recovered on the highway was only $445 and that a wallet (with identification) had been found at the scene — he no longer thought that the green station wagon had been involved in a robbery. Although the parties dispute when Pickard learned the actual dollar amount, both sides agree that Pickard did not relay this information to the other dispatchers until after the Smoaks' station wagon had been stopped.

2

In Cookeville, THP dispatcher Brian Brock, who had taken the initial call from Pickard, put out a "be on the lookout" (BOLO) notification for the green station wagon, stating that such a vehicle had reportedly been seen traveling at a high rate of speed with a large amount of currency flying out of it. Tim McHood, another THP dispatcher in the general vicinity, issued a second BOLO, stating that the vehicle was possibly involved in a robbery. According to McHood's later testimony, he based this on a misreading of Pickard's teletype inquiry about any recent robberies, which he took to mean that the station wagon was involved in a "possible robbery," but "[w]e're not sure."

Pickard called McHood to relay the information that a wallet with a South Carolina identification[1] belonging to James Smoak had been found with the money. McHood (still under his misapprehension) sent out another broadcast, informing the THP troopers that the green station wagon was from out of state and that the police had found large amounts of money and an ID.

David Bush, a THP trooper who had heard the BOLOs about a "possible recent robbery," spotted a green station wagon traveling east on Interstate 40 and followed it for eight miles. During that time, Bush did not observe the vehicle either speeding or committing any other traffic violations. He radioed McHood with the station wagon's license plate number, and McHood replied that the information from the station wagon matched Smoak's identification, which other troopers had found with the currency. According to the district court and the THP troopers, McHood instructed Bush to stop the car, but not do so without backup. There is some dispute, however, as to whether, in actuality, Bush might have been solely responsible for the decision to ask for back-up.

---

[1]The Smoaks lived in North Carolina, but James Smoak spent part of every week living with his parents in South Carolina, where he owned and operated a seafood business. His driver's license was from South Carolina.

3

Regardless, McHood and Bush requested backup from other THP troopers in the area, and THP dispatcher Brian Brock called City of Cookeville police dispatchers for additional backup. Brock told the city dispatchers that "we're fixing to have *a felony stop* on a vehicle . . . possible *armed* robbery out of Nashville" (emphasis added). Again, before signaling James Smoak to stop the station wagon, Bush requested and received confirmation that the Nashville division of the THP wanted the vehicle stopped. Four officers arrived to provide backup and participate in the stop — Lieutenant Jerry Andrews and Trooper Jeff Phann of the THP, and two Cookeville police officers.

At the time of this incident, Bush had been a trooper with the THP for nine years and had conducted six felony stops. He testified at his deposition that "based on my training, if there's any probability that a felony has occurred, we treat that as a high-risk stop." He further testified that he elected to proceed with a felony stop "based on the information that my dispatch was giving me."

Bush initiated the felony stop of the Smoaks' car somewhere near Cookeville at 5:15 p.m. At that same time, the THP in Nashville relayed the information that they knew the exact amount of cash that had been found in the median, but neither McHood nor the troopers in the field inquired as to that amount.

Most of the events of the stop were recorded on the video camera in Bush's cruiser. Once the station wagon pulled over, neither the THP troopers nor the Cookeville officers approached the car. Instead, Bush called to the "driver" over the loudspeaker, and instructed him to exit the vehicle, place his hands in the air, walk backwards around the car, and finally, to get on his knees with his hands laced behind his back. Trooper Bush did the same for the two passengers — first Pamela Smoak and then her son Brandon. Only after the Smoaks were kneeling on the ground did the

4

troopers approach and, somewhat frantically, apply handcuffs, while the obviously confused and increasingly agitated Smoaks demanded to know why they had been stopped.

As the Smoaks knelt on the pavement and troopers applied the handcuffs, the two Cookeville officers — one wielding an assault rifle and the other a shotgun — prowled a few feet away, their raised guns tight against their shoulders and trained on the Smoaks. Although this gesture was superficially menacing and surely intended as an intimidating show of force, the way these two officers paced and shuffled behind the troopers, wavering guns gripped white-knuckled in their hands, exhibits such nervousness and fear that, even on video, the tension is palpable and the ensuing events are almost predictable. It is also worth noting that, prior to trial, the troopers testified that pointing a gun at a suspect, absent the justification for deadly force, is a significant departure from customary professional police practices, and that the correct position of an officer's gun is in the "down ready" position until deadly force is warranted. Nothing in this record provides a justification for deadly force, and this was *not* the "down ready" position.

Meanwhile, handcuffed on the side of the highway and still wholly uninformed about why they had been stopped, the Smoaks asked the troopers several times to "please shut the door[s]" of the station wagon so that their dogs would not escape from the car onto the highway. The troopers ignored these requests. When Mrs. Smoak's son, Brandon, asked Trooper Phann if he could close the passenger-side door, Phann ordered him not to move. Lieutenant Andrews approached the driver's side of the car, determined that there were no other passengers, and closed the driver-side door. At this point, Mrs. Smoak can be heard clearly, saying: "My dog is not mean, he will not hurt you."

5

While Phann was handcuffing Brandon, the Smoak's one-year-old bulldog/bull terrier mix, General Patton, jumped from the still-open passenger-side door and — with ears up and tail wagging — bounded through the tall grass alongside the highway. According to the Smoaks, the dog was headed toward James Smoak, but Eric Hall, the Cookeville police officer with the shotgun, moved to intercept; according to Hall, however, the dog was pursuing him and he was retreating in fear. Either way, Hall back-peddled in a slight semi-circle, toward the handcuffed, prone, and now-shouting Smoaks, with the excited dog following (tail wagging vigorously). Then, directly in front of the camera, when the dog had almost reached Hall, Hall stopped, leaned down with the shotgun and — with the gun's muzzle almost touching the dog's face — fired. The dog's head exploded in a mist of blood, bone, and brain, and its lifeless body dropped from the camera's view.

James and Pamela Smoak both jumped to their feet, James wailing "You shot my dog, you shot my dog," and Pamela screaming and crying "Why did you do that?" Trooper Phann still had hold of Brandon and had not allowed him to his feet. While Pamela stood screaming, Lt. Andrews and Trooper Bush grabbed the still-handcuffed and now grief-stricken and sobbing James Smoak and drove him to the ground, the weight of all three men landing on James's left knee. With James face-down on the ground, the two troopers knelt over him and Lt. Andrews knelt on his head, pinning it to the ground. James ultimately needed surgery to repair the damage to his knee.

Meanwhile, the Cookeville officers turned their guns on Pamela Smoak and ordered her to get back down on her knees, which she did without further violence on the part of the officers. The troopers put the Smoaks into separate patrol cars, after which Bush and Hall can be seen on the videotape grinning and laughing. At 5:23 p.m., Bush advised dispatcher Brock that the Smoaks were

6

in custody and Brock should "ask Nashville the charges." Brock replied that no robberies had been reported and that James Smoak was not wanted for any crimes. At that point, Andrews and Bush determined that a mistake had been made, but the last of the handcuffs was not taken off for another 10 minutes.

The entire incident lasted 29 minutes, even though the THP troopers knew within the first 20 minutes that the Smoaks were innocent of any wrongdoing. After the Smoaks drove off, the videotape records Bush lamenting that "I wish I had never stopped that f...ing car." It is perhaps telling, however, that far from showing remorse, Bush later testified that he would have conducted the same stop even without the information concerning a possible robbery because a report of a speeding car with a wallet and money coming out of it might indicate a car-jacking. Andrews and Phann, on the other hand, testified that they would not have conducted a felony stop had they had all the facts known to the dispatchers at the time. Pickard had actually joked with another dispatcher that someone had probably lost all his money, which reminded him of something his kids would do.

The Smoaks sued the City of Cookeville, the Cookeville officers and dispatchers, and the THP troopers and dispatchers under 42 U.S.C. § 1983, claiming unreasonable seizure and excessive force, in violation of the Fourth Amendment. The Smoaks also raised a state-law claim,[2] asserting that the officers had conspired to protect Hall by making false statements in their police reports and to the media. The Smoaks settled with the City of Cookeville and all of the Cookeville defendants, including Officer Hall, the officer who shot their dog. The remaining defendants — the THP

---

[2]The Smoaks actually raised several state-law claims, but all the others were dismissed under 12(b)(6).

7

troopers and dispatchers — did not settle, but proceeded through discovery and moved for summary judgment on the unreasonable-seizure, excessive-force, and conspiracy claims.

The district court dismissed the conspiracy claim as unsupported by the facts, but denied the defendants' qualified-immunity-based motions on the other two claims. Although the court did not "discern any actual excessive force" from the restraint of James Smoak, it nonetheless denied summary judgment on all aspects of the excessive-force claim. The THP defendants — three troopers and two dispatchers — filed an interlocutory appeal from the denial of qualified immunity.

On appeal, a splintered panel of this court produced three separate opinions. *See Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006). The lead opinion determined that Lt. Andrews and Trooper Bush were not entitled to qualified immunity on the excessive force claim because a jury could conclude from the facts as alleged by Smoak that their actions of slamming him to the ground after Hall had shot the dog, were a clearly established violation of the Fourth Amendment, *id.* at 784, but the defendants were entitled to qualified immunity on the other claims, *id.* at 782-782. A separate opinion would have awarded qualified immunity to all five defendants on all claims. *Id.* at 786-87. The third judge opined that — after careful review of the video — none of the defendants was entitled to qualified immunity. *Id.* at 787-89.

The case was sent back to the district court for a jury trial — on only the excessive force claims against Lt. Andrews and Trooper Bush — and the jury ultimately concluded that Andrews had not used excessive force on James Smoak and had not injured him, but that Bush had. The jury awarded Smoak $9,102.80 in compensatory damages (primarily his medical expenses) and $192,248.72 in attorney's fees, for a total jury verdict of $210,351.52. Bush now appeals.

**II.**

**A.**

Bush's first claim on appeal is that the district court erred by denying his Rule 50 motion. For the reasons that follow, we disagree.

We review a district court's denial of a Rule 50 motion *de novo*. *Ford v. Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008). We do not weigh the evidence or question the credibility of witnesses. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008). We may not substitute our judgment for that of the jury; instead, we must view the evidence in the light most favorable to the jury's verdict and the jury's verdict must be given the benefit of all reasonable inferences. *Id*. The motion may be granted and the district court reversed, only upon a finding that "reasonable minds could not come to a conclusion other than one favoring the movant." *Id*.

Bush contends that "the [d]istrict [c]ourt, without analysis or explanation, automatically, applied legal findings from the earlier appeal to the different set of facts introduced at trial." Apt. Br. at 19-20. Bush then argues that we need not grant deference to Smoak's rendition of the facts because the cruiser-cam video provides us with objective evidence from which we can draw more accurate findings of fact. Apt. Br. at 22-23 (citing *Scott v. Harris*, 550 U.S. 372 (2007), and *Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007)). But, this approach (and the cases Bush has cited in support of it) applies to summary judgment, not to Rule 50 motions after a jury verdict. Bush asks us to do what we are expressly forbidden to do — to look at the video and substitute our judgment for that of the jury. Bush's reliance on this case law is misplaced and this proposal is untenable.

For the second part of his argument, Bush contends that he was entitled to use the amount of force he used because (1) Smoak was a robbery suspect, (2) "even though [he] was handcuffed, he could still be viewed as posing a threat," and (3) "he was noncompliant and actively resisting." Apt. Br. at 25. Smoak, on the other hand, along with his wife Pam, step-son Brandon, and his doctor, contend that Officer Bush used more force than was necessary. More importantly, the jury watched the video, and then found that — despite Bush's claims to the contrary — Bush used more force than was necessary. Unless we are to say, as a matter of law, that a police officer may use as much force as he likes to subdue a noncompliant but handcuffed robbery suspect, the question of how much force in this situation is too much is a question for the jury. And, unless we are to re-write or ignore our standard of review, we must defer to the jury's reasonable interpretation of the evidence, no matter how we might feel about that evidence if we were to assess it ourselves.

Again, Bush is asking us to do what the law flatly forbids — to substitute our opinion for that of the jury based on a re-weighing and reinterpreting of the evidence. This we will not do.

**B.**

Bush's second claim on appeal is that the district court erred by denying him qualified immunity. We disagree.

Bush argues that, "[e]ven if a reasonable jury could find that Trooper Bush used excessive force in restraining Mr. Smoak, qualified immunity would still apply because it was not clearly established that his actions were improper." Apt. Br. at 30. That is, Bush argues that he could not have known that it would be improper to take hold of a man whose hands are bound behind his back and, using the full weight of his body, drive that defenseless man to the pavement.

"The law is . . . clear that force can easily be excessive if the suspect is compliant." *Wysong v. City of Heath*, 260 F. App'x 848, 855 (6th Cir. 2008) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004)). "There is no government interest in striking someone who is neither resisting nor trying to flee." *Id.* (citing *Smoak I*, 460 F.3d at 784, and *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). We do not hesitate to say that "it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation [Bush] confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Hence, it was clearly established that the force Bush used was excessive.

Of course, if the officers were proceeding on the basis of a mistake, and "[i]f their mistake was reasonable, then the law permit[s] [the officers] to effectuate their arrest using force reasonably necessary from the perspective of a reasonable officer on the scene." *Ingram v. City of Columbus*, 185 F.3d 579, 598 (6th Cir. 1999) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989), and *Hill v. California*, 401 U.S. 797, 804-05 (1971)). Thus, we consider whether Officer Bush was reasonably mistaken.

Bush contends that he deemed this level of violence necessary at the time because Smoak was "noncompliant," though he concedes that Smoak's only "noncompliant act" was his visceral reaction to Officer Hall's horrifying shotgun blast to the dog's head — Smoak stood up when he had been ordered to kneel. But, in the totality of the encounter, Smoak had been fully compliant. Bush signaled Smoak to pull over, which Smoak did. Rather than approach the driver's side window to speak with Smoak — as every driver knows is customary in a traffic stop — Bush shouted to Smoak over the loudspeaker, ordering him first to throw his keys out the window onto the highway; then

11

to exit the car with his hands over his head and walk backwards to the rear of the car; and then to kneel down on the pavement. Smoak complied promptly with every instruction. As ordered, Smoak knelt there with his hands behind his back while Bush ordered Smoak's wife and step-son to exit the car and kneel on the pavement, hands up. Bush never explained to these hapless travelers why he had stopped them or why they were being thus treated, but Smoak nonetheless complied with every instruction. As the family knelt on the side of the highway — the Cookeville officers' guns trained on them — Smoak complied while the troopers secured his hands behind his back, handcuffed his wife and step-son, and looked in his car. Up to this point, Smoak was remarkably compliant — in fact, commendably so.

When Hall shot the dog, Smoak stood up, crying out, "You shot my dog, you shot my dog!" Despite the fact that both Bush and Andrews had hold of the handcuffed Smoak, that Trooper Phann had hold of Smoak's step-son, Brandon, and that the two Cookeville officers had guns at the ready, Bush contends that he thought it was necessary to slam Smoak to the ground, i.e., that this use of force was, at most, a reasonable mistake. We disagree. Having reviewed the evidence, including the video, we find this use of force clearly unreasonable. Bush has not established that he was entitled to qualified immunity.

## III.

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court.

**Cole, Circuit Judge, concurring.** I fully concur in the lead opinion. I write separately to note that I would also affirm the district court's denial of Bush's Rule 50(b) motion under law-of-the-case principles. Because Bush can point to no way in which the facts confronting us now differ from those facing us when we denied him summary judgment and qualified immunity, *see Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006) ("*Smoak I*"), I would draw the same conclusions of law from those facts as the *Smoak I* panel did. *See Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) ("'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))); *see also* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.2 (2009) ("Deference to an earlier panel ruling is properly deepened because the decision typically involves the concurrent judgment of two or more judges . . . . [F]ree reexamination would encourage multiple appeals, undertaken in the sole hope that a second panel will accept arguments that failed to persuade the first.").

When this case was previously before this Court, we denied summary judgment to Bush on Smoak's excessive force claim based on the following reasoning:

> In many of the cases involving excessive force, the plaintiff's resistance is what triggered the use of force from the officers. *See, e.g.*, *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (holding that the officers' use of force to handcuff a suspect was necessary because the suspect "acknowledged that he 'twisted and turned some' when they tried to handcuff him and that the officers had difficulty restraining him"); *Darrah*, 255 F.3d at 307 (upholding an officer's use of force because "Officer Bragg and the other members of his arrest team were in the middle of a boisterous and unruly group of picketers attempting to make an arrest of an individual who was resisting their efforts"); *see also Tapp v. Banks*, 1 Fed. Appx. 344, 350 (6th Cir. 2001) (unpublished) (holding that "it is not objectively reasonable for an officer

13

dealing with an essentially compliant person, to strike the person's legs twelve to fifteen times in the absence of resistance").

James [Smoak], in contrast, was initially compliant with the police officers' demands, and he jumped up only after his dog had been shot right in front of him. Given that James was handcuffed, a reasonable officer would not have "knocked his legs out from under him, and [thrown] him to the pavement face-first." James alleges that he suffered physical injuries that required both admission to a hospital and subsequent surgery. *A jury could find that a reasonable officer would not have reacted this forcefully to a handcuffed man who showed no signs of noncompliance until his pet was killed in front of his family.*

The THP troopers argue, however, that James' allegations are unambiguously controverted by the videotape taken of the incident. This argument fails because *the video does not so clearly undermine James's claim as to permit us to ignore our charge to accept all of the Smoaks' allegations as true. See Turner* [*v. Scott*], 119 F.3d [425,] 428 [(6th Cir. 1997)] (holding that defendants may collaterally appeal the denial of qualified immunity only when the facts are uncontested). Although the video does not appear to show any swiping of James's legs, his head twice gets very close to the ground before going out of the camera's range, which is consistent with his allegations.

Based on the facts as alleged by the Smoaks, James was handcuffed, generally compliant, and obviously reacting in horror to the shooting of his dog. The law is clearly established that, in this situation, tackling James in the manner he alleges would not have been a reasonable way to restrain him. *Cf. Burchett*, 310 F.3d at 944 (permitting officers to tackle a suspect who was resisting arrest). We therefore affirm the district court's denial of qualified immunity to Andrews and Bush on this one aspect of the Smoaks' excessive-force claim. *This is not to say that a jury hearing all of the evidence will ultimately agree with James's version of the facts, but we are unable to hold as a matter of law that his version is not worthy of belief.*

*Smoak I*, 460 F.3d at 783-84 (emphasis added). Following a trial, a jury found that Trooper Bush had used excessive force.

In his current appeal, Bush points to four specific ways in which he claims the evidence adduced at trial repudiated the facts presumed true by the *Smoak I* panel, such that no reasonable jury could have believed them. In reviewing a Rule 50 motion, we view the evidence "in the light most

favorable to the party against whom the motion is made." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). Viewed in this light, none of the four asserted instances of "new" evidence renders the set of facts before us different from that assumed by the *Smoak I* court.

First, Bush asserts that the trial testimony established that when Smoak jumped up at the sound of the gunshot, he moved *toward* the officer who had fired the shot, justifying Bush in restraining Smoak by pulling him back by the hand-cuffs. Bush claims that this evidence differs from the deposition testimony on which the *Smoak I* court relied. However, the *Smoak I* court viewed the video of the event, so it was aware of the extent to which Smoak was moving toward the firing officer when he jumped up. In addition, based on the video evidence and the testimony, the jury could have believed that Smoak did not make a definitive or pronounced movement toward the officer firing the shot. (*E.g.* Smoak Tr. 61 ("It seems that my body moves over [in the video] - - I don't know if I actually stepped [i.e., took a step toward the officer].").) Moreover, the *Smoak I* opinion did not purport to rely on the fact that Smoak did not move in the direction of the officer who fired the shot. Therefore, this "discrepancy" in the evidence does not alter the *Smoak I* court's analysis.

The second way Bush claims the testimony at trial differed is that Smoak admitted at trial that when he jumped up upon hearing the gunshot, he did so in violation of the officers' instructions to remain on his knees. However, the *Smoak I* court assumed that Smoak was violating instructions when he jumped up, noting that Smoak was "*initially* compliant" and "showed no signs of noncompliance *until* his pet was killed." *Smoak I*, 460 F.3d at 783 (emphasis added). Judge Cook made the same argument Bush now makes in her dissent in *Smoak I*, and the majority implicitly

rejected it. *Id*. at 786-87 (Cook, J., dissenting) (noting that Smoak "jumped to his feet . . . despite being ordered to remain in the kneeling position"). Therefore, this purportedly new testimony does not change the *Smoak I* court's analysis.

The third and fourth ways Bush claims the trial testimony differed from Smoak's previous allegations to the *Smoak I* court relate to the manner in which Smoak was brought to the ground. The *Smoak I* panel assumed the truth of Smoak's allegation that Bush "knocked his legs out from under him, and [threw] him to the pavement face-first." *Smoak I*, 460 F.3d at 783. The panel further stated, "[a]lthough the video does not appear to show any swiping of James's legs, his head twice gets very close to the ground before going out of the camera's range, which is consistent with his allegations." *Id*. at 784. Bush argues that the trial testimony showed that the tackling of Smoak did not involve any swiping of the legs, and that it was Andrews, not Bush, who pushed Smoak's face to the ground. However, Smoak did testify, as he had in the deposition testimony considered by the *Smoak I* court, that Bush forced him face-down onto the ground. Describing to the jury what was happening in the video, Smoak testified: "[h]e has swept my legs out from under me, so I'm headed down now . . . I'm getting ready to hit my knee - - my head is a little higher than my knees, but it's still - - when you are cuffed with your hands behind your back, you hardly have any choice once you're in that position. It's knees or head." (Smoak Tr. 25.) This suggests, and the jury reasonably concluded, that Bush forced or threw Smoak to the ground face-first, even if it was Andrews who allegedly proceeded to "put[] [Smoak's] face in the pavement." (Smoak Tr. 25.)

At bottom, this appeal is a renewal of Bush's argument that his actions, as shown on the video, did not amount to excessive force because he was making a split-second judgment, dealing

16

with a non-compliant robbery suspect, and using an objectively reasonable level of force. These are the same arguments Bush made to the *Smoak I* panel, and that panel rejected them. Bush is not entitled to another bite at the apple. Once it is established that the evidence at trial, viewed in the light most favorable to Smoak, was identical to the evidence presumed true by the *Smoak I* panel, affirmance is appropriate on the ground that the holding in *Smoak I* is the law of the case with respect to what conduct may constitute excessive force and what conduct is or is not entitled to qualified immunity.